IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| GERALDINE HOPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-0947-CV-W-HFS |
| | ) | |
| FIRE MOUNTAIN RESTAURANTS, INC. | ) | |
| d/b/a RYAN'S FAMILY STEAK HOUSE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Geraldine Hopkins filed suit against defendant Fire Mountain Restaurants, Inc. d/b/a Ryan's Family Steak House, asserting a claim for negligence against defendant for injuries she sustained when she tripped and fell at a Ryan's Family Steak House restaurant in Independence, Missouri. Defendant has filed a motion for summary judgment. For the reasons set forth below, defendant's motion for summary judgment will be denied.

**I.      Summary Judgment Standards**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, and it must give that party the benefit of all reasonable inferences to be drawn from the

evidence. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999).

A party seeking summary judgment bears the initial burden of demonstrating to the court that an essential element of the non-moving party's case is lacking. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden then shifts to the non-moving party to come forward with sufficient evidence to demonstrate that there is a factual controversy as to that element, or to explain why such evidence is not currently available. Id.; Fed. R. Civ. P. 56(e). In resisting summary judgment, the non-moving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); 10B Charles Alan Wright et al., Federal Practice and Procedure §§ 2739, 2727 (3d ed. 1998). In other words, the non-movant must do more than merely assert that there is a genuine issue of material fact. With these principles in mind, the court turns to an analysis of defendant's motion.

## II.     Background

On March 13, 2004, plaintiff Geraldine Hopkins went to Ryan's Family Steak House in Independence, Missouri for lunch with her daughters Beth Williams and Sharon Lundberg, her grandson Trevor Williams, and her son-in-law Garold Lundberg. She had been to this particular Ryan's restaurant on prior occasions. Plaintiff and her family arrived at the restaurant at about 1:30 p.m. Upon arrival, they all ordered the buffet and paid, and then a hostess led them to their table. In following the hostess to the table, plaintiff and her family walked down an aisle parallel to the food bars before turning left down an aisle with a row of tables on either side. The aisle between the rows of tables was perpendicular to the aisle running in front of the food bars. Beth Williams testified that the food bar aisle was not more than 5 feet wide. Williams Depo. 17:5-13. Plaintiff

2

testified that their table was the second one back from the food bar aisle (apparently on the left side of the aisle separating the table rows). Plf. Depo. 24:1-5.[1] Plaintiff and her family used this same route (utilizing the aisle between the table rows and the food bar aisle) when traveling between their table and the food bars, and when attempting to exit the restaurant after their meal. Williams testified that there was a partial wall on the far side of their table, so the aisle between the table rows was the only way to get to and from their table. Williams Depo. 19:6-19.

Plaintiff testified that the aisle between the table rows was 2 to 2½ feet wide; Williams testified that the aisle was 2½ feet wide. Plf. Depo. 24:6-14; Williams Depo.15:17-21. Williams also testified: "The tables were very packed in there. It was hard to move. When we were seated, there were people at the tables on either side of us, and you could barely squeeze in to get into your seat. . . . There was very little room to walk." Williams Depo. 14:17-24. Plaintiff testified that during lunch, she went to the food bars at least twice. Plf. Depo. 20:20-23.

Across the aisle between the table rows, on the right side, the first table back from the food bar aisle was arranged differently than the rest of the tables in that row. Plaintiff testified that this table was sitting "catty-corner," while the rest of the row's tables were "sitting square." Plf. Depo. 22:23-23:6. Plaintiff asserts that, as a result, part of the chair on the side of the catty-corner table was in the aisle. "Ryan's had positioned the chair to where you could not sit at the table without putting the chair in the walkway which made another blockade." Plf. Depo. 40:6-9. Plaintiff testified that when they arrived, the chair in question was not occupied, but there was a man sitting on the other side of that table. Plaintiff thinks that after she and her family got their her food, a

---

[1] Williams testified that their table may have been the third instead of the second back from the food bar aisle, but she was not sure. Williams Depo. 11:14-12:5.

3

woman came to join the man and sat in the chair. Plf. Depo. 21:13-22:7.

When plaintiff and her family finished their meals, they got up to exit the restaurant. "The crowding was at the time when we were leaving. . . . There should have been a larger thing – walkway. The tables were too close to the salad bar for the place. It was just too crowded to get in and out." Plf. Depo. 38:23-24, 39:21-24. Plaintiff was walking less than 1 foot behind her grandson Trevor. Plf. Depo. 32:5-18. "By the time we finished, the place was jammed and people were coming in, going out. I mean we – there was people in front of my grandson and he just kept going and we kept trying to – it was just crowded." Plf. Depo. 38:9-13. Williams was following about 2 feet behind plaintiff. Williams Depo. 23:2-10. The Lundbergs were behind Williams.

Proceeding up the aisle between the table rows, plaintiff noticed a chair in her path, sticking out into the aisle. This was the chair occupied by the woman sitting on the side of the catty-corner table. "[S]he got into the walkway with her chair because the chair had to be out there to get somebody to sit in it." Plf. Depo. 16:22-17:1. The woman was sitting with one leg crossed over the other. Plf. Depo. 32:19-33:3. Plaintiff noticed that a waist to hip length coat was hanging on the back of the woman's chair.[2] Plf. Depo. 33:20-24, 35:3-7. Plaintiff did not have any concerns about the coat, nor did she see anything about the coat that would make her fall or be dangerous. Plf. Depo. 33:25-34:9. Plaintiff made a right turn around the chair and thinks that she probably brushed up against the coat in the process. Plf. Depo. 35:8-11. Plaintiff testified that just after completing the right turn (around the chair and into the food bar aisle), her right foot got caught in a lanyard that was in the coat's pocket, causing her to trip and fall, injuring her left knee. Plf. Depo. 35:12-20,

---

[2] Plaintiff does not remember whether the coat was on the back of the chair when plaintiff and her family went to get their food. Plf. Depo. 22:8-17.

4

44:12-45:6. Plaintiff testified that the lanyard "held my foot up in the air and down I went." Plf. Depo. 37:1-2. Plaintiff never saw the lanyard (before or after she fell). Plf. Depo. 37:5-19. Plaintiff testified that if the lanyard had not been in the coat's pocket, she would not have fallen. Plf. Depo. 36:18-37:2.

While sitting at the table, Williams saw the woman sitting in the chair and noticed that there was a coat on the back of it. Williams Depo. 24:13-24. As noted, when they were leaving, Williams was walking right behind plaintiff. Williams first saw the lanyard right before plaintiff fell. Williams Depo. 28:10-12. Williams testified that it looked like a shoelace hanging out of the coat pocket; about 8 to 12 inches were hanging out of the pocket, and about 6 to 8 inches were touching the floor. Williams Depo. 28:17-29:5. Williams saw plaintiff fall; she tried to warn plaintiff by saying, "Mom, stop," but it was too late because she was already in the middle of her fall. Williams Depo. 23:2-15, 29:23-24. "I saw her foot get caught in the lanyard and I tried to stop her, but she was in the middle of the step. When she finished that step, she fell." Williams Depo. 25:20-26:1. Williams explained that as plaintiff was stepping, the lanyard got wrapped around her ankle and pulled her foot back, causing her to lose her balance and fall forward. Williams Depo. 30:2-4. After the fall, Williams pulled the lanyard off plaintiff's ankle and tossed it out of the way; she did not look to see what was on the end of it. Williams Depo. 30:7-15. Williams did not talk to the woman in the chair. Williams Depo. 30:16-22.

After the fall, a Ryan's employee (who never identified herself) approached Williams and plaintiff and asked for plaintiff's address and phone number; Williams gave them plaintiff's driver's license. Williams Depo. 32:10-21. Apparently the employee copied plaintiff's name, address, phone number, date of birth and age onto a "Customer Incident Report." When plaintiff signed the

Report, it only contained her personal identification information.[3]  Plf. Depo. 46:25-47:16. According to the Report, plaintiff's fall occurred at about 2 p.m., and the area surrounding plaintiff's fall was free of debris and dry.  Plf.'s Ex. B.

Defendant has identified four individuals who were serving as managers or assistant managers on the date of plaintiff's accident – Pam Southers, Greg Littrell, Darlene Simmons and Jennifer Lloyd.  Plf.'s Ex. C.  Jennifer Lloyd was the Ryan's general manager on duty that day and participated in investigating the accident.  Lloyd Aff. ¶¶ 4, 6.  Her affidavit states that she was not aware of the lanyard and had not been told about the lanyard by any of her employees.  Lloyd Aff. ¶¶ 8-10.  Lloyd also states that in her 11 years with Ryan's, she had never seen or heard of a customer tripping over another customer's clothing or something hanging out of the pocket of another customer's clothing.  Lloyd Aff. ¶ 5.

On August 9, 2005, plaintiff filed suit against defendant in the Circuit Court of Jackson County, Missouri, Associate Division.  Plaintiff's complaint asserts that defendant was negligent in various respects, including:

> a. Defendant negligently overcrowded the tables within the restaurant resulting in very limited room between the tables;
> b. Defendant negligently allowed items to be placed on the floor of the restaurant, which items extended into the walkway of patrons going to and from their table;
> c. Due to the overcrowding of the tables, the items that were on the floor in the walkway of other patrons were not clearly visible due to the closeness of the tables and the number of people that were walking back and forth carrying food.

---

[3]Plaintiff testified that the rest of the information was filled in by restaurant employees later, and she disputes the accuracy of some of the statements in the Report.  Plf. Depo. 47:13-48:9.  For example, it says that she fell over a coat but does not mention the lanyard, it says that she was wearing tie shoes when they were actually Velcro shoes, and it says she was using other chairs as support as she was walking when she did not do so.  Id.

Compl. at ¶ 6(a)-(c). On October 7, 2005, defendant removed the case to this court on the basis of diversity jurisdiction.

**III. Analysis**

Missouri law governs this premises liability case. To prevail in a negligence action, a plaintiff must establish (1) the existence of a duty on the part of the defendant to protect the plaintiff from injury, (2) failure of the defendant to perform that duty, and (3) that the plaintiff's injury was proximately caused by defendant's failure. Krause v. U.S. Truck Co., Inc., 787 S.W.2d 708, 710 (Mo. banc 1990). "The general duty owed to an invitee by the owner of the premises is the exercise of reasonable and ordinary care in making the premises safe." Morrison v. St. Luke's Health Corp., 929 S.W.2d 898, 903 (Mo. Ct. App. 1996). The liability of the defendant is predicated on the foreseeability of the risk and the reasonableness of the care to the plaintiff, which is "a question of fact to be determined by the totality of the circumstances, including the nature of the store's business and the method of its operation." Head v. National Super Markets, Inc., 902 S.W.2d 305, 308 (Mo. Ct. App. 1995).

In order to recover in a trip and fall case, a plaintiff must demonstrate (1) that a dangerous condition existed on the defendant's premises which involved an unreasonable risk, (2) that the defendant knew or by using ordinary care should have known of the condition, (3) that the defendant failed to use ordinary care in removing or warning of the danger, and (4) as a result, the plaintiff was injured. Rycraw v. White Castle Sys., Inc., 28 S.W.3d 495, 499 (Mo. Ct. App. 2000). The plaintiff must show that the instrumentality that caused his or her injury was either inherently dangerous and/or defective, or that is was placed in such a way that it created a dangerous condition. Id.

**A. Dangerous condition**

7

Case 4:05-cv-00947-HFS   Document 26   Filed 09/01/06   Page 7 of 14

As a preliminary matter, the court notes that defendant focuses primarily on the lanyard as the allegedly dangerous condition. Plaintiff did testify that if the lanyard had not been there, she would not have fallen. However, the theory of plaintiff's case is that defendant was negligent in overcrowding the tables, resulting in limited space in the aisle between the tables, which in turn made it very difficult (if not impossible) for her to see items on the floor in the aisle that might obstruct her path. Thus, the court's analysis will focus on the alleged overcrowding of the tables.

Plaintiff argues that the configuration of the tables constituted a dangerous condition involving an unreasonable risk of harm. There is no evidence that the tables themselves were inherently dangerous or defective. Therefore, the inquiry is whether the tables were "placed in such a way that [they] created a dangerous condition." Rycraw, 28 S.W.3d at 499. In Badovinatz v. Brown, the plaintiff alleged that he tripped over concrete blocks on a scaffolding on which he was standing and asserted that the concrete blocks' presence constituted a dangerous condition. 192 S.W.3d 445, 446-47 (Mo. Ct. App. 2006). The Missouri Court of Appeals explained that a dangerous condition finding could only be made if there was evidence from which it could be inferred that the blocks "were so placed that a person on the scaffold might not notice them and, consequently, might trip over them." Id. at 449. In opposing summary judgment, the plaintiff did not produce any testimony, diagrams, pictures or other depiction of how the blocks were stacked or where they were placed on the scaffolding, other than that the blocks were on top of the scaffolding. Id. Affirming the trial court's grant of summary judgment, the Court stated: "The absence of evidence from which it can be inferred *why* the concrete blocks constituted a *dangerous* condition is fatal to Plaintiffs' case." Id.

In contrast to Badovinatz, plaintiff in this case has adduced evidence from which it can be

8

inferred that the configuration of the tables constituted a dangerous condition. Plaintiff and her daughter Beth Williams both testified that the aisle between the tables rows was 2 to 2½ feet wide. Williams further testified that the tables "were very packed in there" and that it was hard to move. Further, she testified that "there were people at the tables on either side of us, and you could barely squeeze in to get into your seat. . . . There was very little room to walk." Plaintiff testified that across the aisle between the table rows, on the right side, the first table back from the food bar aisle was sitting "catty corner" (while the others were sitting square), and that the chair on the aisle side of that table was positioned such that a person "could not sit at the table without putting the chair in the walkway." Plaintiff contends that her fall occurred as she made a right turn around this chair and tripped on a lanyard hanging out of the pocket of the coat on the back of the chair.

Plaintiff's negligence theory is not novel or outlandish. Courts from other jurisdictions have determined that the arrangement of tables and chairs could form the basis for a negligence claim in a trip and fall case. In Seiders v. Testa, the restaurant's hostess seated the plaintiff and a friend at the middle table in a row of three tables; the tables and chairs were made of rattan. 464 A.2d 933, 934-35 (Me. 1983). When the plaintiff tried to push back her chair and stand up, she struck the chair of a fellow diner behind her, and her leg got caught between the table leg and the chair leg, at which point she lost her balance and fell, taking the table with her. Id. at 934-35. In upholding the verdict, the Supreme Judicial Court of Maine reasoned that "the jury rationally could have found the defendants negligent, either in placing their tables and chairs in such a configuration that the plaintiff was likely to encounter the obstacle that she did while attempting to arise, or in failing to foresee that patrons could easily move the lightweight tables and chairs around so as to bring about the same result." Id. at 935. The Court also noted that "[t]he defendants here . . . may be charged not only

9

with maintaining reasonably safe premises for an individual patron, but also with anticipating the reasonably foreseeable actions of other patrons and the effects of those actions upon the safety of the dining room." Id.

Similarly, in Klemetsen v. H & R Block, Inc., the plaintiff alleged that defendant was negligent in its positioning of two chairs on one side of a table. 569 So. 2d 559, 560 (La. Ct. App. 1990). When the plaintiff attempted to slide her chair backwards, her chair leg caught the chair leg next to her. Id. at 560. The plaintiff rose and tried to slide out to the her left, only to trip and fall. Id. The jury found negligence on the defendant's part. Id. The Louisiana Court of Appeals rejected the defendant's argument that the plaintiff failed to show there was an unreasonable risk of harm: "The jury could and apparently concluded that insufficient space between the legs of the table and/or failure to arrange the chairs so that only one student would have been placed on either side of the table, contributed to plaintiff's fall." Id. at 561.

In light of the testimony outlined above and the Seiders and Klemetsen decisions, the court finds that plaintiff has met her burden of adducing evidence from which a reasonable jury could infer that the arrangement of the tables constituted a dangerous condition and contributed to her fall. Whether the tables' arrangement created a dangerous condition involving an unreasonable risk of harm is a question of fact for the jury and should not be resolved on summary judgment. See Hunter v. Ramada Worldwide, Inc., No. 1:04CV00062ERW, 2005 WL 1490053, at *4 (E.D. Mo. June 23, 2005) (citing Harris v. Niehaus, 857 S.W.2d 222, 226 (Mo. 1993)).

**B.     Knowledge of dangerous condition and failure to use ordinary care**

As to the second element of plaintiff's claim, defendant must have had actual or constructive notice of the allegedly dangerous condition. The court finds that this element has been satisfied.

Because defendant's employees were presumably responsible for and involved in arranging the tables and chairs,[4] actual notice of the allegedly dangerous condition is imputed to defendant. See Breckenridge v. Meierhoffer-Fleeman Funeral Home, Inc., 941 S.W.2d 609, 613 (Mo. Ct. App. 1997) (stating that when an agent of defendant has knowledge of a hazardous condition, such knowledge is deemed to be actual notice of such condition to defendant); Hammond v. Wal-Mart Stores, Inc., 971 F.2d 158, 160 (8th Cir. 1992) (finding defendant had actual notice of dangerous condition because it was created by defendant's employees "who left the slippery signs leaning against a table unattended in a busy shopping aisle").

With regard to the third element, defendant must have failed to use ordinary care in removing or warning of the danger. As discussed above, plaintiff has come forth with evidence that the arrangement of the tables was a dangerous condition creating an unreasonable risk, and that defendant had knowledge of the condition. There is no evidence that defendant provided any warnings about the tables' allegedly dangerous configuration. In any event, though, it is for the jury to decide whether defendant breached its duty to plaintiff by failing to use ordinary care in removing or warning of the danger. See Hellman v. Droege's Super Market, Inc., 943 S.W.2d 655, 658 (Mo. Ct. App. 1997) (stating that whether a defendant's conduct falls below the standard of care is a question of fact for the jury).

### C. Causation

---

[4]There is no evidence in the record that restaurant customers had moved the tables or were otherwise responsible for the arrangement of the tables or chairs. And even if there was such evidence, defendant would still have had actual notice of the tables' arrangement because the hostess who led plaintiff and her family to their table would have seen the arrangement. See, e.g., Morrison, 929 S.W.2d at 904 (finding that defendant had knowledge of the briefcase's presence on the hallway floor, as its employee escorting plaintiff down the hallway should have seen the briefcase directly in plaintiff's path).

11

As to the final element of plaintiff's trip and fall negligence claim, plaintiff must demonstrate that defendant's negligence caused plaintiff's injury. To prove the causal connection necessary to establish negligence, the plaintiff must show both causation in fact and proximate cause. Heffernan v. Reinhold, 73 S.W.3d 659, 664 (Mo. Ct. App. 2002). A defendant's conduct is the cause in fact of a plaintiff's injuries "where the injuries would not have occurred 'but for' that conduct." Id. at 664. The test for proximate cause is "whether an injury is the natural and probable consequence of the defendant's negligent conduct." Stanley v. City of Independence, 995 S.W.2d 485, 488 (Mo. banc. 1999). Proximate cause, then, is determined by looking back, after the occurrence, and examining whether the injury appears to be a reasonable and probable consequence of the conduct. Heffernan, 73 S.W.3d at 665. For an act to constitute the proximate cause of an injury, "*some* injury, if not the precise one in question, must have been reasonably foreseeable." Krause, 787 S.W.2d at 710.

A defendant's negligence "need not be the sole cause of the plaintiff's injury, but simply a cause or a contributing cause." Morrison, 929 S.W.2d at 901. "[I]f two or more persons are guilty of consecutive acts of negligence, there is a question as to whether the initial act of negligence was the proximate cause of the injury or whether there was an efficient, intervening cause." Heffernan, 73 S.W.3d at 665. The mere existence of an intervening act is not determinative. Instead, the intervening act "must be a superceding cause that is independent of the original actor's negligence and severs the connection between the original actor's conduct and the plaintiff's injury as a matter of law." Buchholz v. Mosby-Year Book, Inc., 969 S.W.2d 860, 862 (Mo. Ct. App. 1998). Critically, for an intervening act to relieve the original tortfeasor from liability, "the act cannot be a foreseeable consequence of the original act of negligence." Id. at 862.

12

Defendant argues that proximate cause is lacking because plaintiff has not provided evidence demonstrating that defendant should have reasonably foreseen or anticipated plaintiff's injury. The court disagrees. Given plaintiff's evidence that the tables were configured such that there was limited room to move and that a person's view of aisle between the table rows would be obstructed, it is certainly foreseeable that a customer might trip and fall if something was in the aisle. Such an injury is a natural and probable consequence of defendant's conduct in arranging the tables.

Defendant also asserts that the customer's act of leaving a lanyard hanging out of her coat pocket was an intervening cause that eclipsed the role defendant's conduct played in plaintiff's injuries. It is foreseeable that customers visiting a restaurant would bring coats and other personal belongings with them, and that those items would be kept at or near the customers' seats. Contrary to defendant's assertion, there is nothing "surprising, unexpected, or freakish" about plaintiff tripping on a lanyard hanging out of another customer's coat while attempting to maneuver around closely spaced tables. See Sill v. Burlington Northern R.R., 87 S.W.3d 386, 394-95 (Mo. Ct. App. 2002). Thus, the court finds that the customer's conduct in having a lanyard hanging out of her coat pocket was not an intervening act that relieved defendant from liability for its own negligence in the arrangement of the tables.

In demonstrating proximate cause, plaintiff is not required to prove that defendant should have anticipated the exact scenario that resulted in her injuries. Rather, it is enough for plaintiff to show that defendant's arrangement of the tables was "an efficient cause which set[ ] in motion the chain of circumstances leading to the plaintiff's injuries or damages." Buchholz, 969 S.W.2d at 861. More than 50 years ago, in a much more unlikely injury scenario that the one posed here, the Missouri Supreme Court found that proximate cause was a factual question for the jury. In Gladden

13

v. Missouri Pub. Serv. Co., the plaintiff climbed a tree to retrieve his escaped parakeet and in doing so he unintentionally touched an electric transmission line running through the tree's branches, resulting in injuries. 277 S.W.2d 510, 512-13 (Mo. 1955). Defendant contended that its construction and maintenance of the lines did not proximately cause the plaintiff's injuries because defendant "could not have anticipated the presence of adults in the tree where they would come into contact with its wires." Id. at 514. The Court stated: "[W]e do not think we can hold as a matter of law that there was no reasonable basis to anticipate that an adult would be likely to be in a tree situated as this one was. On the contrary, we think this was a jury question." Id. at 515. Likewise, in the case at bar, the court finds that plaintiff has demonstrated that a genuine issue of material fact exists as to whether her injuries were proximately caused by defendant's arrangement of the tables. This factual issue, as well as those discussed above, must be decided by a jury.

**IV.    Conclusion**

For the foregoing reasons, it is hereby

ORDERED that defendant's motion for summary judgment (ECF doc. 20) is DENIED.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

September 1, 2006

Kansas City, Missouri

14